# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JACQUELINE R. COUCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00473** |
| | ) | **Judge Aleta A. Trauger** |
| **MUTUAL OF OMAHA INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are (1) the Motion to Exclude Expert Testimony of Dr. William Grabenstein (Doc. No. 19), filed by defendant Mutual of Omaha Insurance Company ("Mutual of Omaha"), and (2) Mutual of Omaha's Motion for Summary Judgment (Doc. No. 26), which is premised, at least in part, on the presumptive exclusion of Dr. Grabenstein's opinion testimony.

As set forth herein, the court will grant in part and deny in part the defendant's Motion to Exclude. Under that ruling, Dr. Grabenstein would not be barred from testifying as a properly disclosed expert treating physician under Federal Rule of Civil Procedure 26(a)(2), subparts (A) and (C). That partial victory for the plaintiff, however, is effectively meaningless, because Dr. Grabenstein will not be permitted to testify beyond the scope of his actual treatment of the decedent. Because he did not treat the decedent or consult with her treating physicians at any time at or even near the time of her hospitalization and death, he will not be permitted to testify as to the cause of death. As a result, the plaintiff has no expert testimony as to the decedent's cause of death to rebut that of the defendant's experts. Without such proof, she cannot withstand the

defendant's Motion for Summary Judgment. That motion, therefore, will be granted, and the case will be dismissed with prejudice.

## I.     MOTION TO EXCLUDE

### A.     Facts and Procedural History

Plaintiff Jacqueline Couch initiated this lawsuit against Mutual of Omaha in the Circuit Court for Montgomery County, Tennessee in June 2022, asserting a single claim for breach of contract. Mutual of Omaha promptly removed the case to this court on the basis of diversity of citizenship.

The contract at issue is the Accidental Death Insurance Policy ("Policy") that the plaintiff's now-deceased mother, Nancy Couch ("the decedent"), purchased from Mutual of Omaha in December 2019. The Policy names the plaintiff as the sole beneficiary and provides for the payment to her, in the event her mother dies of accidental death as defined by the Policy, in the amount of $200,000. (Doc. No. 1-1, Complaint ¶¶ 4–5; Doc. No. 29-1, Policy.)

Specifically, the Policy provides as follows:

> If, while insured under this policy, an *insured person* sustains an *injury* which results in death within 365 days following the date of the *injury*, we will pay the Accidental Death Benefit shown on the policy schedule.

(Doc. No. 29-1, at 5 (emphasis in original).) The Policy defines the term "injury" as:

> bodily harm which:
>
> (a) is the result of an accident or trauma that occurs while your policy is in force; and
>
> (b) results in loss independently of sickness and all other causes (except for sickness caused by the injury).

(*Id.*)

The decedent died on August 5, 2020 after a ten-day stay at Tennova Hospital in Clarksville, Tennessee. The decedent's Death Certificate states that no autopsy was performed but

identifies the "chain of events (diseases, injuries, or complications) that directly caused the death" as:

    a. Comfort measures only

    b. Acute respiratory failure

    c. Septic shock

    d. Chronic obstructive lung disease

(Doc. No. 29-8.) Under "other significant conditions contributing to death but not resulting in the underlying cause," the Death Certificate lists: "Found down, left eye hematoma, subconjunctival hematoma, accidental fall, . . . ventricular tachycardia cardiac arrest." (*Id.*)

Jacqueline Couch filed a claim with Mutual of Omaha to collect the Accidental Death Benefit under the Policy. On May 10, 2021, Mutual of Omaha denied the claim, on the basis that there was "no evidence that injury caused or contributed to [the decedent's] death." (Doc. No. 1-1, at 17.) It cited the decedent's Death Certificate and records from Tennova Hospital and Montgomery County Emergency Medical Services in support of its decision to deny the claim. (*Id.*)

By letter dated August 18, 2021, counsel for the plaintiff wrote to Mutual of Omaha, contesting the denial and providing what counsel characterized as proof that the decedent's death was the result of a fall, in the form of a letter from the decedent's treating physician, Dr. Bill Grabenstein. (*Id.* at 20.) In this letter, dated May 26, 2021 and addressed "To Whom It May Concern," Dr. Grabenstein described his thirty-year history as, not only the decedent's family practice doctor, but also her daughter's (the plaintiff's) and her deceased husband's. Based on his having treated the decedent over the years, Dr. Grabenstein was aware that she had "an occasional drink" but denied that she had "alcoholism that caused any problems with family or with her work." (*Id.* at 21.) He acknowledged that the decedent had chronic anxiety and pain for which she

took "occasional pain medication and occasional Benzodiazepine for muscle relaxer." (*Id.*) Dr. Grabenstein also expressed an opinion as to the cause of the decedent's death, apparently based on his review of the "medical records presented to [him]" relating to the decedent's hospital admission on July 27, 2021 and the treatment she received prior to her death on August 5, 2021. It is his opinion, based on these records, that the decedent's death

> was due to an accidental fall at the home by herself. The cause of death was listed on the death certificate and by the discharging physicians as a diagnosis they observed in her during the hospitalization. However, she did not have these conditions or they were not as severe until she fell. I therefore think that the reasons of the death given by the attending physicians and on the death certificate are complications due to her fall.
>
> Before she had fallen, although she does have some medical conditions, they were stable and she was independently living by her own [sic], was able to drive, etc.
>
> When she fell, she suffered a concussion, loss of consciousness and was found on the floor for greater than 24 hours, causing her to go into acidosis, etc., and have multiple complications. The cause of death was the fall, the other problems were complications due to the fall.

(*Id.* at 21–22.)

Mutual of Omaha considered Grabenstein's letter and had a board-certified forensic pathologist review the decedent's medical records. It nonetheless reaffirmed the decision denying the decedent's daughter's claim for benefits. (*Id.* at 23.)

The plaintiff filed suit in May 2022. Following the defendant's removal of the case to this court, an Initial Case Management Order ("ICMO") was entered on August 16, 2022. As relevant here, the ICMO provided for the completion of written discovery and the depositions of fact witnesses by February 24, 2023 and for the identification and disclosure of expert witnesses and production of expert witness reports by both parties no later than March 17, 2023. Rebuttal witnesses and reports were due by April 14, 2023. Expert witnesses were to be deposed by June

30, 2023, and dispositive motions were due no later than August 25, 2023. (Doc. No. 16.) Trial is set for January 9, 2024. (Doc. No. 17.)

The defendant propounded expert disclosures and expert reports for two retained experts, Dr. Scott Radow and Dr. John Hunsaker, on the deadline for expert disclosures. (*See* Doc. No. 20, at 5; *see also* Doc. Nos. 29-12 (Radow Expert Report), 29-13 (Hunsaker Expert Report).) There is no dispute that the plaintiff did not file an expert report or a formal expert disclosure for Dr. Grabenstein. However, in her February 7, 2023 answer to the defendant's interrogatory requesting the identity of all individuals the plaintiff intended to call as an expert, the subject matter of the expected testimony, and a detailed statement of the "substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion," the plaintiff identified Grabenstein and further stated:

> Dr. Grabenstein was the primary physician for the decedent for approximately thirty years. He could testify as to her good health, alleged alcoholism, and alleged drug abuse. See attached letter from Dr. Grabenstein.

(Doc. No. 34-2, at 4–5.) Grabenstein's May 26, 2021 "To Whom It May Concern" letter was attached as an exhibit.

According to the defendant, it contacted the plaintiff to schedule Grabenstein's deposition in January 2023, and the parties originally agreed to conduct the deposition on February 23, 2023, within the deadline for fact witness depositions. However, in light of the plaintiff's interrogatory answer that appeared to disclose Grabenstein as an expert, albeit an expert treating physician, the deposition was ultimately postponed until June 2023. At his deposition, the defendant questioned Grabenstein about his treatment of the decedent and the statements in his May 26, 2021 letter. The defendant also confirmed that, as revealed by the decedent's medical records, the last time Grabenstein saw the decedent as a patient was in September 2019, nearly a year prior to her death in August 2020, and he did not consult with or see her while she was in the hospital from July 27

through August 5, 2021. (Doc. No. 29-9, 40-1, Grabenstein Dep. 15.)[1] Dr. Grabenstein nonetheless also testified at length regarding his opinion as to the plaintiff's cause of death.

Following the close of all discovery, Mutual of Omaha filed its Motion to Exclude Expert Testimony of Dr. William Grabenstein, citing Federal Rules of Civil Procedure 37(c)(1) and 26 and Local Rule 39.01(c)(5)(C). It argues that Dr. Grabenstein should not be permitted to testify as an expert at all—either as a retained expert (because he did not produce an expert report as required by Federal Rule of Civil Procedure 26(a)(2)(B)) or as an expert treating physician (because the plaintiff's "cursory interrogatory response does not meet the standard for non-retained expert disclosures under Fed. R. Civ. P. 26(a)(2)(C)")—and should instead be permitted to testify as a fact witness only. (Doc. No. 20, at 2.) Alternatively, it argues that, even if the plaintiff's interrogatory answer qualifies as an adequate Rule 26(a)(2)(C) disclosure, Grabenstein's testimony as a treating physician must be limited to "facts disclosed during care and treatment of the patient and his observations or opinions formed during the treating relationship," which ended on September 11, 2019, the date of his last encounter with the decedent. (Doc. No. 20, at 16 (internal quotation marks and citation omitted).)

In response, the plaintiff argues that Grabenstein is not a retained expert and was not required to provide a written report under Federal Rule of Civil Procedure 26(a)(2)(B). Instead, she argues, he is a treating physician whom she properly identified as an expert in accordance with Rule 26(a)(2)(A) and for whom she provided the requisite disclosure, as required by Rule 26(a)(2)(C), insofar as her interrogatory answer and the attached May 26, 2021 letter

---

[1] The defendant filed two complete copies of Grabenstein's deposition transcript, both in condensed form, with four transcript pages per physical page. The court refers herein to the deposition transcript by its original pagination, rather than to the pagination assigned by the court's electronic filing system.

"demonstrate[] fully the basis for his opinions." (Doc. No. 34, at 10.) She also apparently believes that he should be permitted to offer opinion testimony as to the cause of the decedent's death, because he determined her cause of death "[a]s a part of [his] medical practice." (*Id.* at 4.)

More specifically, and apparently in response to Mutual of Omaha's argument that, if allowed to testify at all, Dr. Grabenstein's opinions must be limited to his own treatment of the decedent, the plaintiff has submitted the Declaration of Dr. Grabenstein, in which he avers that his review of the decedent's medical records and his offering an opinion as to her cause of death are part of his ordinary medical practice. Dr. Grabenstein explains that his medical practice provides a "private concierge practice, which is known as MD VIP," pursuant to which he provides his cell phone number to each of his patients. (Doc. No. 39-2, Grabenstein Decl. ¶ 4.) Besides providing "day-to-day care" for his patients, he is available for consultation by telephone, follows up with family members, and reviews "the manner by which [a] patient's treatment has benefitted each patient." (*Id.*) He states that, following the decedent's death, he "made investigation to determine the cause of her death, and the reasons her death occurred" for three reasons: (1) to make sure that he had provided adequate care; (2) to consider whether additional treatment might have been helpful or resulted in a different outcome; and (3) to "help[] in the treatment of Jacqueline R. Couch," who remains his patient, as she was understandably upset about her mother's death. (*Id.* ¶ 5; *see also id.* ¶ 8 (explaining that, following the decedent's death, he "met with Jacqueline Couch to discuss her death, and to discuss what had happened" and to "determine if any medical conditions [of the decedent] might also be things to watch in the treatment of Jacqueline R. Couch").) He asserts that, as part of his ordinary practice and the treatment of the decedent, he obtained and reviewed her hospital records and determined (1) that his office had provided proper care; and (2) that the decedent died "as a result of a fall," which he discussed with Jacqueline

Couch. (*Id.* ¶ 8.) He further attests that the plaintiff has not retained him as an expert in this case and that he has not charged the plaintiff a fee, because reviewing the decedent's hospital records, providing an opinion as to the decedent's cause of death, and writing the May 26, 2021 letter to Mutual of Omaha are all simply part of his "duty as a Medical Doctor." (*Id.* ¶ 12; *see also id.* ¶ 16 ("My only opinion related to the death of [the decedent] comes from the fact that I was her Physician, and attempted to determine the cause of her death as a part of my practice and to assist her daughter.").)

The defendant filed a Reply (Doc. No. 40), arguing that the court should reject Dr. Grabenstein's novel "concierge practice" theory as to why he should be able to proffer an expert opinion on the decedent's cause of death eleven months after he last saw her and based, not on his treatment of her, but on his review of medical records created by other practitioners. It insists that, if Dr. Grabenstein is permitted to testify at all, his testimony must be limited to factual knowledge obtained during the course of his actual treatment of the decedent.

### B.     Legal Standards

Federal Rule of Civil Procedure 26(a)(2) governs expert disclosures. It provides generally that any party must disclose the identity of any witness the party may use to present opinion evidence by an expert witness under Federal Rule of Evidence 702, 703, or 705. Fed. R. Civ. P. 26(a)(2)(A). In addition, any witness "retained or specially employed to provide expert testimony in the case" must provide a written report prepared and signed by the witness. Fed. R. Civ. P. 26(a)(2)(B). The required contents of such report are further dictated by rule. *Id.*

However, if the expert witness is not required to provide a report under Rule 26(a)(2)(B), then the expert disclosure required by Rule 26(a)(2)(A) must state:

> (i) the subject matter on which the witness is expected to present evidence under
> Federal Rule of Evidence 702, 703, or 705; and

(ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C).

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

### C.    Whether Dr. Grabenstein's Testimony Must Be Excluded

As indicated above, Mutual of Omaha contends that Dr. Grabenstein is effectively a retained expert, insofar as he seeks to offer an opinion well outside the scope of his treatment of the plaintiff, and, therefore, that the plaintiff was required to provide an expert report for him in compliance with Rule 26(a)(2)(B). Because she did not comply with that rule, it argues, Dr. Grabenstein's expert testimony should be excluded under Rule 37(c). Insofar as the plaintiff seeks to have Dr. Grabenstein testify as an expert treating physician from whom no expert report is required, the defendant argues that the plaintiff's "cursory interrogatory response does not meet the standard for non-retained expert disclosures under Fed. R. Civ. P. 26(a)(2)(C)," as a result of which Dr. Grabenstein should be permitted to testify as a fact witness only, rather than an expert of any kind. In response, the plaintiff asserts that she was not required to provide an expert report for Dr Grabenstein, the decedent's treating physician, and that her interrogatory answer fully complied with the requirements of Rule 26(a)(2)(C). She also argues, implicitly at least, that Dr. Grabenstein should be permitted to offer an opinion as to causation, because his concierge medical practice included following up on his deceased patient to determine her cause of death, even though he was not involved in providing treatment at the time of death.

The court agrees with the plaintiff in part. The law is clear that a witness who is "retained or specially employed to provide expert testimony in the case" must provide a written report

containing certain required disclosures. Fed. R. Civ. P. 26(a)(2)(B). However, for witnesses who are not required to file a written report, a disclosure must simply be made in accordance with the less onerous disclosure standard Rule 26(a)(2)(C). A treating physician is generally exempt from the written report requirement for expert testimony. *See Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007) ("[A] treating physician . . . can be deposed or called to testify at trial without any requirement for a written report." (quoting Fed. R. Civ. P. 26(a), cmt. 1993 Amendments, subdivision (a), para. (2)). As a treating physician, Dr. Grabenstein was not required to produce an expert report.

As set forth above, Rule 26(a)(2)(C) requires that a disclosure from a non-retained expert, such as a treating physician, state only "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." In this case, the disclosure provided by the plaintiff basically complied with that rule. She identified Grabenstein as the plaintiff's treating physician in response to the interrogatory requesting the identity of any expert witness she intended to call at trial, and she identified the subjects on which he expected to testify as the decedent's "good health, alleged alcoholism, and alleged drug abuse." (Doc. No. 34-2, at 5.) She also cross-referenced and attached the May 26, 2021 letter, in which Dr. Grabenstein summarizes his opinions and the bases for those opinions. (Doc. No. 34-3.) Moreover, although the disclosure was somewhat cursory, the defendant had the opportunity to question Dr. Grabenstein at his deposition on his treatment of the plaintiff and the formation of his opinions regarding her condition when he last saw her. The defendant, that is, cannot claim that it did not know that the plaintiff intended to rely on Dr. Grabenstein to offer opinions as the decedent's treating physician or that it did not have

adequate opportunity to explore the substance of his proposed opinions or the grounds on which they are based. The court finds that Dr. Grabenstein may testify as the plaintiff's treating physician.

In that capacity, however, the scope of Dr. Grabenstein's testimony is subject to limitations. A treating physician is exempt from supplying an expert report only to the extent that his proffered opinions were actually formed during the course of treatment. *See Fielden*, 482 F.3d at 870 ("It is within the normal range of duties for a health care provider to develop opinions regarding causation and prognosis *during the ordinary course of an examination*." (quoting *Martin v. CSX Transp., Inc.*, 215 F.R.D. 554, 557 (S.D. Ind. 2003)) (emphasis added)); *see also Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 810–11 (6th Cir. 2005) (finding that the trial court did not abuse its discretion in excluding that part of a treating physician's opinion on the cause of the plaintiff's injury, insofar as the causation opinion was based on a video of the accident, rather than the examination and treatment of the plaintiff, and was formed months after the accident, rather than at the time the physician treated the plaintiff); *Tomazin v. Lincare, Inc.*, No. 3:13-cv-875, 2015 WL 4545658, at *10 (M.D. Tenn. July 27, 2015) (Trauger, J.) (excluding a treating physician's opinion as to the cause of the decedent's death, where the physician had last seen and treated the decedent seven months prior to her death and did not consult on her care in the weeks leading to her death, and his opinions "were formed not in the course of treating Decedent, but in anticipation of litigation").

Thus, to the extent the plaintiff intends to offer Dr. Grabenstein to testify as to the cause of the decedent's death, based on his discussions with the plaintiff and his review of documents outside his own treatment notes and records obtained while he was actively treating the decedent, such testimony would clearly exceed the scope of Dr. Grabenstein's personal knowledge of the decedent based on his own examination and treatment of her. It is undisputed that the last time he

saw the decedent was in September 2019. He never saw her or consulted in her care after she was hospitalized in July 2020, and any opinions based on the hospital records, the plaintiff's photograph of her mother on the floor, and discussions with the plaintiff's daughter in 2021 would be outside the scope of his treatment of the decedent. In order to offer an opinion based on these types of records and data, an expert report in accordance with Rule 26(a)(2)(B) would be required.

The plaintiff contends that, because Dr. Grabenstein was not "retained" as an expert or paid for his opinions by the plaintiff, he was not required to produce an expert report. The fact that he was not paid or retained, however, is not material, nor is it material that litigation was not actually "pending" at the time Dr. Grabenstein formed his opinions, as set forth in the March 26, 2021 letter. (*See* Doc. No. 34, at 3.) What is relevant is the fact that Dr. Grabenstein's opinions about the cause of decedent's death were not formed during his treatment of her or based on his personal knowledge. *See Fielden*, 482 F.3d at 870. Instead, they were formed at the request of the plaintiff for the purpose of rebutting the insurance company's determination that the "injury" requirement of the Policy had not been triggered—even if the plaintiff had not yet retained counsel or filed suit at the time Dr. Grabenstein prepared the May 26, 2021 letter.

Likewise, the court is not persuaded by the plaintiff's creative and novel arguments that examination of the decedent's hospital records and determination of the cause of her death were integral to Dr. Grabenstein's "concierge" practice and his treatment of the plaintiff herself, as the decedent's daughter. As the Sixth Circuit noted in *Fielden*, "[t]he determinative issue is the scope of the proposed testimony," and a treating physician will be exempt from the Rule 26(a)(2)(B) expert report requirement only so long as the "treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden*, 482 F.3d at 871. Dr.

Grabenstein's treatment of the *plaintiff* does not permit him to testify about the causation of her *mother's* death, and his own curiosity as to causation does not obviate the fact that his opinion about the decedent's cause of death is largely based on a review of the decedent's medical records created eleven months after the last time Dr. Grabenstein saw or treated her.

In sum, because Dr. Grabenstein was properly disclosed as an expert treating physician under Rule 26(a)(2)(A) and (C), his testimony will not be excluded in its entirety, and no sanctions of any kind are warranted under Rule 37(c). However, because Dr. Grabenstein is not a retained expert who submitted an expert report, he may testify only as a treating physician, and the scope of his testimony will be limited to his personal observation, diagnosis, and treatment of the plaintiff while she was actually in his care. The defendant's Motion to Exclude will, therefore, be granted in part and denied in part. While Dr. Grabenstein may, consistent with the disclosure provided in response to interrogatories, testify about the decedent's "good health, alleged alcoholism, and alleged drug abuse" *at the time he last examined her*, he may not proffer an opinion as to the cause of her death.

## II.    MOTION FOR SUMMARY JUDGMENT

The defendant moves for summary judgment on the plaintiff's breach of contract claim on the basis that (1) the plaintiff cannot meet her burden of proving that the decedent's death was caused by a qualifying "injury" under the Policy without expert medical testimony; and (2) the plaintiff cannot rebut the testimony of the defendant's experts to the effect that the decedent's death was subject to an exclusion under the Policy, because disease or bodily infirmity caused or contributed to her death. In response, the plaintiff asserts that Dr. Grabenstein's opinion as to the cause of death gives rise to a material factual dispute as to whether the death was caused by a qualifying injury. The plaintiff also relies on her own testimony regarding her mother's state at the time she found her prone on the floor of her bedroom on July 27, 2020. The court finds that, with

the exclusion of Dr. Grabenstein's opinion as to the cause of death, the plaintiff cannot carry her burden of proof, and the defendant is entitled to summary judgment.

### A. Undisputed Facts

Some of the undisputed facts relevant to the Motion for Summary Judgment have already been set forth above, but they are repeated here for clarity.

Jacqueline Couch is the daughter of Nancy Couch, the decedent, and is the 100% beneficiary of the Mutual of Omaha Accidental Death Insurance Policy ("Policy") purchased by the decedent prior to her death. The Policy provides, as relevant here, that, "[i]f, while insured under this policy, an *insured person* sustains an *injury* which results in death within 365 days following the date of the *injury*," Mutual of Omaha will pay the death benefit to the Policy beneficiary. (Policy, Doc. No. 29-1, at 5 (emphasis in original).) The Policy defines the term "injury" as:

> bodily harm which:
>
> (a) is the result of an accident or trauma that occurs while your policy is in force; and
>
> (b) results in loss independently of sickness and all other causes (except for sickness caused by the injury).

(*Id.*) The Policy also expressly excludes coverage for any "death resulting directly or indirectly from disease or bodily infirmity." (*Id.* at 8.)

The decedent died on August 5, 2020, and the plaintiff contacted Mutual of Omaha to provide notice of the death and to make a claim under the Policy. (Doc. No. 1-1, Compl. ¶ 7.) The defendant denied the claim on May 10, 2021, citing the Policy's definition of "injury" and the exclusion for death caused by "disease or bodily infirmity." (Doc. No. 1-1, at 17.) The plaintiff sought review of the denial and submitted Dr. Grabenstein's May 26, 2021 letter in support of such review, but Mutual of Omaha affirmed its denial of the claim. (*Id.* at 20–23.)

According to Jacqueline Couch's undisputed testimony, Jacqueline Couch visited her mother frequently, but her mother, as of the time just before her death, lived independently, drove her own car, did her own shopping, made her own doctors' appointments, and was an independent person. (Doc. No. 39-1, Couch Aff. ¶ 14.) Jacqueline Couch's habit was to visit her mother at her home most mornings during the week. (*Id.* ¶ 15.) Her mother appeared to be fine and in "good spirits" when the plaintiff visited her on the morning of Friday, July 24, 2020. (*Id.* ¶¶ 11, 15.)

On Monday, July 27, 2020, after dropping off her youngest daughter at school, the plaintiff dropped by her mother's house as usual. (Doc. No. 29-10, Couch Dep. 11–12.) She found her mother on the floor by her bed, "in a prone position" and unresponsive. (*Id.* at 12; *see also* Doc. No. 39-1, at 6, Photograph.) Jacqueline Couch did not attempt to move her mother and instead called 911. (Couch Aff. ¶¶ 3, 12.)

The plaintiff believes, based on her knowledge of her mother's habits, that her mother fell while walking from the bathroom to her bed. (*Id.* ¶ 4.) Based on a "significant injury" visible on the side of the her head, the plaintiff also believes that her mother hit the footboard of the bed when she fell, "striking her head," and that this "blow to the side of her head rendered her unconscious." (*Id.* ¶¶ 6, 7.) She believes that her mother had been on the ground for a "period of time" after the fall, because bruising to her face had set in and she had soiled herself. (*Id.* ¶¶ 8–9.) Jacqueline Couch concedes, however, that neither she nor anyone else saw her mother fall. (Couch Dep. 41.)

The decedent was admitted to Tennova Hospital in Clarksville on July 27, 2020 and received medical care there until her death on August 5, 2020. (*See generally* Doc. No. 29-3, at 31–40, Doc. No. 29-4, at 1–2, Tennova Hosp. Med. Recs.) According to the Discharge Summary, when she was admitted to the hospital after having been on the floor for "unknown duration," she had a "left eye hematoma, subconjunctival hemorrhage, severe metabolic acidosis PH 6.9, acute

renal failure with Cr 7.9, septic shock, and acute respiratory failure." (Doc. No. 29-3, at 31.) She had a reported history of hypertension, COPD, alcohol abuse, and past tuberculosis. Although she had a "left periorbital and temporal soft tissue contusion," a computerized tomograph scan ("CT scan") of her head on July 27, 2020 was "negative for intracranial process." (*Id.* at 36.) She was noted to be "[t]hin, fragile, severely dehydrated, [and] ill-appearing." (*Id.* at 37.)

Despite treatment efforts following her hospital admission, the decedent's condition did not improve significantly over the next several days. On August 5, 2020, based on her knowledge of her mother's wishes, Jacqueline Couch made the decision to withdraw care other than "comfort measures," such as medication for pain and anxiety, and Nancy Couch died shortly thereafter. (*Id.* at 3.)

Dr. John C. Hunsaker, III, M.D., J.D., M.A., an expert disclosed by the defendant, has submitted an expert report in which he opines as to the cause of the decedent's death, based on his review of her Tennova Healthcare Medical Records and Montgomery County Emergency Medical Services Records, Death Certificate, and Dr. Grabenstein's treatment notes. In relevant part, Dr. Hunsaker summarizes the medical records as follows:

> The decedent, Nancy Couch, a 69-year-old female of Clarksville, TN, was reportedly found by her daughter lying face down on the floor in her bedroom. No one saw the presumptive fall. Mrs. Couch's primary care physician has estimated in his letter to Mutual of Omaha that she lay there unattended for at least 24 up to 36 hours. Emergency Medical Services [EMS] was called to the scene of discovery. She was able to tell the paramedic her name and talked nonsensically from time to time. Mrs. Couch did not complain of pain en route to the Emergency Department [ED]. The squad observed a hematoma [= mass of usually clotted blood that forms in a tissue, organ, or body space as a result of a broken blood vessel] of the left eye region coupled with a subconjunctival [bleeding from breakage of small blood vessel under the clear surface (white) of the eye] hematoma. She was admitted to the Tennova ER in Clarksville and was quickly intubated because of a history of COPD, her daughter's comments about the decedent's long history of alcoholism [= alcohol abuse disorder], and some positive drug screen results. Mrs. Couch did not follow simple commands in the ED. Urine drug screen was positive for opiates

[narcotics] and benzodiazepines [sedatives]; ethanol was not detected. Past medical history was remarkable for the following diagnoses:

- coronary artery disease with emplacement of stent in the right coronary artery (April, 2006);

- hypertension;

- elevated blood fats [hypercholesterolemia];

- chronic obstructive pulmonary disease [COPD];

- peptic ulcer;

- lung right upper lobe cavitation and scar (recovered tuberculosis)

- easy bruisability.

Medication list consisted of the following prescriptions: clonazepam; diazepam; meclizine [antihistamine for dizziness]; Advair [for breathing difficulty]; Olmesartan [for hypertension]; pantoprazole [for gastroesophageal reflux]; sertraline [for depression]; simvastatin; Spiriva [a bronchodilator]. She did have some injury to her head and face, but CT [computed tomography] scans of the head and neck showed no trauma or consequences, specifically skull, facial, or cervical fractures or dislocations, intracranial bleeds on or within the brain or spinal cord, brain swelling or shifts of the brain components, or gas inside the skull. CT did demonstrate left periorbital and temporal soft tissue contusion. Hospital course was characterized by progressive clinical deterioration. She had extensive red skin discoloration on both shins. On 8-3-20 Mrs. Couch experienced cardiac arrest requiring extensive resuscitation. She died in the hospital about 9 days after admission. She was pronounced dead at 6:25 PM on 8-5-20 at Tennova. An autopsy was not conducted. Dr. Yasser Mohamed Omar signed the death certificate. The extensive, complicated discharge diagnoses were recorded as follows:

• acute encephalopathy;

• altered mental state;

• acidosis, metabolic and respiratory;

• acute renal failure;

• dehydration [low total body water];

• hypoxemia [low body oxygen];

• pulmonary edema;

• pulseless ventricular tachycardia [PEA];

• respiratory failure;

• urinary tract infection;

• sepsis

• anemia [red blood cell (oxygen transporting throughout body) deficiency]

The death certificate formulates the proximate COD as follows: "a) comfort measures only, b) acute respiratory failure [= inability of the lungs to perform their basic task of gas exchange, the transfer of oxygen from inhaled air into the blood and the transfer of carbon dioxide from the blood into exhaled air. Respiratory failure occurs because of the failure of the exchange of oxygen and carbon dioxide in tiny air sacs in the lung (alveoli), failure of the brain centers that control breathing, or failure of the muscles required to expand the lungs that can cause respiratory failure], c) septic shock [= widespread infection causing organ failure and dangerously low blood pressure], d) chronic obstructive lung disease." Other significant conditions included "found down, left eye hematoma, subconjunctival hematoma, accidental fall, ventricular tachycardia, cardiac arrest." Manner of death was natural.

(Doc. No. 29-13, at 6–8 (bracketed comments in original).)

In answer to the question whether accidental bodily injury caused or contributed to the decedent's death, Dr. Hunsaker stated as follows:

No. The soft tissue injuries to Mrs. Couch's face and left arm did not cause or contribute to her death. There are several fundamental bases for this opinion.

(1) First there is no evidence, circumstantial or physical, that Mrs. Couch fell impacting her periorbital face, lost consciousness, and remained prone until she was

discovered by her daughter. While it is probable she experienced some cranial impact from a blunt object, the actual mechanism and timing of such an impact remains an open and likely unanswerable issue.

(2) A CT scan is highly effective in detecting brain bleeding, brain swelling, and skull fractures, none of which were revealed during Mrs. Couch's hospitalization.

(3) Mrs. Couch, by clinical records and her daughter's history, regularly consumed considerable amounts of drinking alcohol for a lengthy period of time. One result is liver damage. Such pathophysiological organ damage causes "alcoholics" to bruise and bleed easily. Minor head trauma often causes contusions to the skin of the liver-damaged person but is insufficient to cause brain injury or dysfunction. Moreover, other predisposing factors for easy bruisability in Mrs. Couch's case are age and gender.

(*Id.* at 8–9.)

Asked whether sickness caused or contributed to the decedent's death, Dr. Hunsaker opined as follows:

Yes. . . . Mrs. Couch had a very high number of serious illnesses, *i.e.*, comorbidities, which were capable of causing her to become quite ill and to die. Dr. Grabenstein has documented this multitude over the years. Foremost are smoking-related COPD and organic heart disease [coronary artery disease and hypertensive heart disease]. Remittent urinary tract infections—common in elderly women—are a potential substrate for generalized infection [sepsis] with shock and demise. Emaciation exacerbates these pathologies. Chronic renal disease and failure compound the potential for sudden death in such a context. It is difficult to point to one of these disease states as being exclusively responsible for her death. The systemic infection led to life-threatening hypoxemia [low blood oxygen], and the combination of anemia and the multisystem comorbidities referenced above disrupted her metabolic homeostasis [= the tendency toward a relatively stable equilibrium between interdependent elements, especially as maintained by physiological processes] to a degree incompatible with life.

(*Id.* at 9.)

Scott Radow, M.D., F.C.C.P., also disclosed by the defendant as an expert, similarly opines in his Expert Report that, despite a "contusion to her forehead," visible upon the decedent's hospital admission, "no brain injury was observed, and no skull or facial bones were injured." (Doc. No. 29-12, at 9.) Dr. Radow noted that, according to the hospital records, "the only injuries present upon Mrs. Couch's arrival at Tennova Healthcare were [a] skin tear on Mrs. Couch's left

arm, the periorbital soft tissue contusion and the conjunctival hematoma in her left eye." (*Id.*)

While it was "unknown when these injuries were sustained," his opinion is that none of these

injuries "caused or resulted in Mrs. Couch's death." (*Id.*) Based on his review of Tennova's

records, Dr. Radow summarized the decedent's condition upon her hospitalization, course of

treatment at the hospital, and ultimate cause of death, as follows:

> While in the ER, Nancy Couch was found to be profoundly acidotic, with acute . . . chronic renal insufficiency. A urine drug screen demonstrated positive results for opiates and benzodiazepines. . . . She was responsive to verbal and tactile stimuli but was confused and lethargic. Oxygenation was preserved. She was intubated primarily for airway protection. In the ICU on July 30, it was recorded . . . that she had severe protein-calorie malnutrition. Her hospital course was one of steady deterioration in her hemodynamic and respiratory status with ventilator dependence, pressor dependence, septic shock, and persistent altered mental status. These conditions were not the result of the skin tear on her arm or the periorbital soft tissue injuries sustained before arriving at Tennova Healthcare.
>
> . . . .
>
> Nancy Couch's death was caused by the combination of her multiple medical problems. Mrs. Couch's medical records prior to her admission to the ER on July 27, 2020 demonstrate her debility and malnutrition and large amount of psychotropic medication in her bloodstream, compounded by her alcoholism. The records describe a woman in poor and declining health. Her actions immediately preceding admission to Tennova on July 27, 2020 are unknown but based on my review of the medical records provided, I cannot rule out metabolic encephalopathy in the setting of severe debility. Alcohol withdrawal and transient ischemic attack (mini stroke) are additional considerations. The lack of intracranial trauma on her head CT scan makes head trauma an improbable source of her medical deterioration. The preorbital soft tissue injuries did not result in her death or cause the conditions that led to her death. Rather, Mrs. Couch's death was the result of her multiple underlying chronic and significant existing health conditions.

(*Id.* at 9–10 (internal citations to the medical record omitted).)

## B.     Standard of Review

Summary judgment is appropriate where there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very

terms, this standard provides that the mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). Any affidavits or declarations on which either party relies "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In reviewing a summary judgment motion, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

### C.     Discussion

The Policy was issued and delivered in Tennessee, and there is no suggestion that it contains an enforceable choice-of-law provision requiring the application of the law of some other state. There is no dispute that Tennessee law applies to this diversity breach of contract dispute. (*See* Doc. No. 27, at 6–7.)

Under Tennessee law, "[a]n insurance policy is a contract, and as such, [the court's] analysis must be grounded in principles of contract law." *Christenberry v. Tipton*, 160 S.W.3d 487, 492 (Tenn. 2005). Under these principles, the terms of an insurance policy "should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) (quoting *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012)). "The policy should be construed as a whole in a reasonable and logical manner, and the language in dispute should be examined in the context of the entire agreement." *Id.* (internal quotation marks and citations omitted).

Generally, "contracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Id.* However, when the language of an insurance policy is clear and unambiguous, the court is bound to give effect to that language. *Clark*, 368 S.W.3d at 441.

"It is elementary in insurance law that a claimant under an insurance policy has the initial burden of proving that he comes within the terms of the policy." *Blaine Constr. Corp. v. Ins. Co.*

*of N. Am.*, 171 F.3d 343, 349 (6th Cir. 1999) (applying Tennessee law). If the plaintiff carries that burden, the insurer has the burden of proving that a policy exclusion applies and prevents recovery. *Id.*

         *1.*      *The Plain Language of the Policy*

The Policy provides for payment of the Accidental Death Benefit if the insured "sustains an *injury* which results in death." (Doc. No. 29-1, at 5.) "Injury" means "bodily harm" that

> (a) is the direct result of an accident or trauma that occurs while your policy is in force; and
>
> (b) results in loss independently of sickness and all other causes (except for sickness caused by the injury).

(*Id.*) Thus, under the plain language of the Policy, in order for the plaintiff to prove that the decedent's death fell within the scope of coverage, she must be able to show that the decedent (1) suffered some accident or trauma that (2) directly caused the death, independent of all other causes except for "sickness caused by the accident or trauma." (*Id.*) The exclusion for "death resulting directly or indirectly from disease or bodily infirmity," *id.* at 8, simply reiterates and reinforces the coverage provision. In short, death must be caused exclusively by the bodily harm resulting from an accident or trauma.

Both the Tennessee Supreme Court and the Sixth Circuit construe similarly worded policies thus. As the Sixth Circuit has explained:

> When a policy insuring against accidental death contains exclusionary language substantially to the effect that benefits are precluded where death directly or indirectly results from or is contributed to by disease, the inquiry is properly limited to determining if the accident alone was sufficient to cause death directly and independently of disease; an exclusionary clause therefore precludes recovery where death results from a pre-existing disease or from a combination of accident and pre-existing disease.

*Ann Arbor Tr. Co. v. Canada Life Assur. Co.*, 810 F.2d 591, 593 (6th Cir. 1987). And in Tennessee, "the language of [similar] exclusionary clauses makes clear the intention of the insurers, if such

intention was not already manifest in the words 'directly and independently of all other causes,'" that a death caused by "an active combination of a pre-existing disease and an accidental injury" is not covered as an accidental death. *Metro. Life Ins. Co. v. Smith*, 554 S.W.2d 123, 128 (Tenn. 1977).

The Tennessee Supreme Court has also confirmed that expert proof is required to establish causation. In *Smith*, only one expert testified for both parties, and his testimony was that, although a traumatic brain injury was the "predominant cause" of the insured's death, his "advanced coronary artery disease was also a causative factor in producing death." *Smith*, 554 S.W2d at 125. That is, according to the expert, "a combination of the traumatic injury and the underlying disease produced death and . . . neither, acting without the other, would have been fatal." *Id.* The Tennessee Supreme Court recognized that the "mere fact an insured is suffering from a disease [does not] automatically, in and of itself, preclude[] recovery" under an accidental death policy. *Smith*, 554 S.W2d at 127–28. Thus, for example, "a cancer-ridden patient may still ride in a scheduled airliner and be killed when it crashes, independently of any other cause or of the operation of his disease." *Id.* at 128. If, however, "such a patient falls and dies after he sustains an injury which ordinarily would not be fatal," then the question of the degree to which death resulted from the fall or disease must be resolved by expert medical opinion. *Id.* Only if there is conflicting expert opinion would a jury question exist. *Id.* Because the expert medical testimony in that case was unrefuted, and that testimony established that coronary artery disease contributed to the plaintiff's death, the Tennessee Supreme Court found that the accidental death policy exclusion for death resulting "directly or indirectly from illness or disease of any kind" indisputably applied, and the insurance

company was entitled to a directed verdict. *Id.* at 128.[2]

### 2. The Plaintiff Fails to Prove Coverage

Mutual of Omaha first argues that the plaintiff fails to prove that the decedent suffered an accident or trauma in the first place, much less an accident or trauma that directly caused her death, independent of all other causes except for "sickness caused by the accident or trauma." The court agrees. Although the plaintiff continues to argue that it is undisputed that the decedent suffered a fall, based on her finding the decedent prone on the floor, no competent evidence establishes how the decedent landed on the floor or that she suffered a trauma in the course of a fall. At this initial step, the plaintiff's claim fails.[3]

Moreover, even accepting for purposes of argument that the decedent indeed suffered a "fall" that qualifies as an accident or trauma, the only injuries she even arguably suffered as a direct result of that fall were a subconjunctival hematoma, a soft-tissue hematoma, and a skin tear on her left bicep. There is no evidence, however, that any of these injuries caused or even

---

[2] Similarly, in *Cooper v. Unum Life Insurance Company of America*, No. 1:09-CV-241, 2010 WL 5859544 (E.D. Tenn. Nov. 16, 2010), *report and recommendation adopted*, No. 1:09-CV-241, 2011 WL 703935 (E.D. Tenn. Feb. 17, 2011), although an autopsy report determined that the decedent's cause of death was "[i]ntra-abdominal hemorrhage due to blunt trauma injuries to the torso" and the manner of death was an accidental fall at the decedent's residence, coverage under the decedent's accidental death policy was appropriately denied, where cirrhosis of the liver was a contributory cause of death (because the cirrhosis led to the increased bleeding), such that the decedent would not have died from the fall if he had not also had cirrhosis. *Id.* at *3–4; *see also id.* at *8 ("[I]n order to prevail, Plaintiff must have shown by a reasonable degree of medical probability that Mr. Cooper's fatal abdominal bleeding would have resulted solely from his fall, irrespective of his cirrhosis. . . . Plaintiff has failed to offer any competent medical proof sufficient to meet her burden on this issue. Further, the autopsy indicates cirrhosis was a another significant condition which contributed to the death.").

[3] Dr. Hunsaker's Expert Report recognizes this fact too: "First, there is no evidence, circumstantial or physical, that Mrs. Couch fell impacting her periorbital face, lost consciousness, and remained prone until she was discovered by her daughter." (Doc. No. 29-13, at 8.) The plaintiff's and Dr. Grabenstein's opinions to the contrary are based on nothing other than speculation.

contributed to the decedent's death, directly or indirectly. Thus, even assuming the fall itself qualifies as an accident and that the decedent suffered minor injuries resulting from that fall, the plaintiff has not proved that the decedent's death resulted from those injuries. Her claim still fails.

Regarding the plaintiff's assertion that her mother hit her head on the footboard of her bed when she fell, thus suffering a concussion and losing consciousness, this testimony in Jacqueline Couch's Affidavit does not create a material factual dispute, because it is not based on "personal knowledge," nor is the plaintiff competent to testify as to the cause of her mother's injuries or death, as required by Federal Rule of Civil Procedure 56(c)(4). The plaintiff's opinions regarding the cause of her mother's death are premised entirely on speculation and are refuted by the medical record, which indicates that the decedent did not suffer any "intracranial process," and by the defendant's experts, both of whom opine that there is no competent medical proof in the record that the decedent suffered a concussion or any serious head injury or that her death could be linked to any such injury. (*See* Doc. No. 29-12, at 10 ("The lack of intracranial trauma on her head CT scan makes head trauma an improbable source of her medical deterioration."); Doc. No. 29-13, at 8 ("The soft tissue injuries to Mrs. Couch's face and left arm did not cause or contribute to her death.").) Because there is no competent proof in the record that the decedent suffered a traumatic head injury, the plaintiff cannot establish that her death resulted, directly or indirectly, from such a head injury.

Finally, even if the plaintiff could prove that the decedent fell and suffered a head injury when she fell, she fails to offer competent proof that, assuming such a fall happened, any head injury incurred in the fall was the sole cause of death, independent of sickness other than sickness caused by the injury, as required by clear terms of the Policy. Insofar as the plaintiff relies on the testimony of Dr. Grabenstein to create a material factual dispute as to the cause of death, the court

has ruled that Dr. Grabenstein has not provided an expert report and may not testify as to the cause of death, because such testimony is outside the scope of his role as the decedent's treating physician.[4]

The undisputed facts are that the decedent was ostensibly fine on Friday, but she was found on Monday on the floor, basically unresponsive, with some minor soft-tissue injuries. Because no one was there and the decedent herself was unable to explain, there is no evidence regarding how the plaintiff landed on the floor, how she incurred the soft-tissue injuries, or whether she even incurred those injuries falling into the position in which her daughter found her. Regardless, the plaintiff lacks evidence sufficient to create a jury question as to whether the decedent died as the direct result of an accidental or traumatic injury, "independently of sickness and all other causes (except for sickness caused by the injury)." (Doc. No. 29-1. at 5.) The plaintiff, therefore, cannot show that the decedent's cause of death "comes within the terms of the policy," *Blaine Constr. Corp.*, 171 F.3d at 349, and the defendant is entitled to summary judgment.

---

[4] Dr. Grabenstein's proffered opinion, in essence, is that, when the decedent fell, she hit her head, suffered a concussion, and was rendered unconscious, which made her unable to turn over once she landed face down on the floor. "Staying in this position, after having lost consciousness, inhibited her breathing," caused her to become acidotic, which in turn caused her death. (Doc. No. 39-2, Grabenstein Decl. ¶¶ 25, 30.) He opines that acidosis was the "injury" the decedent suffered as a result of her fall that led directly to her death. (*Id.* ¶ 32.) In his deposition, however, Grabenstein conceded that the plaintiff's complicating medical conditions, specifically including COPD, among others, hastened her death. (*See* Grabenstein Dep. 28 ("So you take a lung that has COPD and then you lay down, it hastens your decline because you can't exchange gasses like you're supposed to."); *id.* at 51 ("[T]he fall caused the death. The COPD sped up the death."); *id.* at 100 (agreeing that the decedent's "underlying medical conditions" "sped up the rate of death").)

Because Dr. Grabenstein did not present an expert report and his opinions outside the scope of his treatment of the decedent must be excluded, as set forth above, the court is not called upon to consider the sufficiency of his opinions under the Federal Rules of Evidence. If the court were so called upon, however, it would likely find his opinions subject to exclusion under Federal Rule of Evidence 702, as they are premised almost entirely upon speculation rather than actual facts and data—specifically, speculation that the decedent fell, hitting her head and suffering a brain injury that rendered her unconscious.

### 3.     The "Disease or Bodily Infirmity" Exception

Aside from the plaintiff's inability to prove that the decedent's death falls within the scope of the Policy's Accidental Death Benefit, the defendant has also carried its burden of establishing that the exclusion for "death resulting directly or indirectly from disease or bodily infirmity" applies. (Doc. No. 29-1, at 8.) Because the exclusion simply echoes and reinforces the substantive terms of the Policy itself, this simply means that the defendant has presented sufficient evidence to prove that the decedent's death is *not* a covered event.[5] In short, given the exclusion of Dr. Grabenstein's testimony as to causation, the plaintiff lacks competent proof to challenge the opinions of the defendants' experts that the decedent's death resulted, directly or indirectly, from illness or infirmity.

Again, the defendant's experts, Dr. Radow and Dr. Hunsaker, both agree that there is no evidence that a traumatic brain injury—or any injury incurred in the supposed fall—caused death. (Doc. No. 29-12, at 9; Doc. No. 29-13, at 8.) And both testified unequivocally that illness caused the decedent's death. According to Dr. Radow, the death was "the result of [the decedent's] multiple underlying and significant existing health conditions." (Doc. No. 29-12, at 10.) Dr. Hunsaker likewise states that illness led to the decedent's death. (*See* Doc. No. 29-13, at 9 ("Did any sickness cause or contribute to Mrs. Couch's death? Yes.").) He notes her "high number of serious illnesses" that were" capable of causing her to become quite ill and die," including COPD, heart disease, and chronic renal failure, all exacerbated by emaciation. (*Id.*) In his view, it is

---

[5] Normally, as set forth above, a plaintiff bears the burden of proving coverage under a policy term, and, if she meets that burden, the defendant is liable under the policy unless it carries the burden of proving that a policy exclusion applies. In this case, again, the exclusion for "death resulting directly or indirectly from disease or bodily infirmity" simply echoes the policy definition of injury that results in death as an accidental or traumatic injury resulting in death "independently of sickness and all other causes" (Doc. No. 29-1, at 8, 5), reinforcing rather than contradicting it.

"difficult to point to any one of these disease states as being exclusively responsible for her death"; rather, the systemic infection the decedent exhibited upon admission to the hospital led to "life-threatening hypoxemia [low blood oxygen], and the combination of anemia and multisystem comorbidities referenced above disrupted her metabolic homeostasis . . . to a degree incompatible with life." (*Id.*)

Because these opinions stand unrefuted by competent expert opinion to the contrary, the defendant has established that the exception for death caused by "disease or bodily infirmity" applies. For this reason, too, it is entitled to summary judgment.

## III. CONCLUSION

For the reasons set forth herein, the defendant's Motion to Exclude (Doc. No. 19) will be granted in part and denied in part, and its Motion for Summary Judgment (Doc. No. 26) will be granted. This case will be dismissed with prejudice.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge